## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

          Plaintiff,

v.

TIMOTHY ALLEN SUTTON,

          Defendant.

Case No. 24-CR-00168-SEH

## <u>OPINION AND ORDER</u>

A federal grand jury charged Defendant Timothy Sutton in a single-count indictment with possessing a firearm and ammunition as a convicted felon. [ECF No. 2]. He has moved to dismiss the indictment, arguing that the criminal statute under which he is charged, 18 U.S.C. § 922(g)(1), is unconstitutional on its face and as applied to him. [ECF No. 27]. Because *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) remains binding Tenth Circuit precedent, this Court is obligated to follow that decision and deny Sutton's motion. However, even under the framework set out in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the result is the same. Because this Nation's historical tradition of firearm regulation at the time the Second Amendment was adopted includes laws that are analogous to the contemporary disarmament of convicted felons like Sutton,

§ 922(g)(1) is a valid exercise of congressional authority. Therefore, Sutton's motion to dismiss the indictment [ECF No. 27] is denied.

## I. Background/Procedural History

Before he was charged with the instant offense, Sutton was convicted of multiple Oklahoma felonies. In 2001, Sutton was convicted of two counts of possessing cocaine and knowingly concealing stolen property, in violation of Oklahoma law. *See* Case Nos. CF-2000-514, CF-2000-513, Washington County District Court, State of Oklahoma; [ECF No. 2]. In 2005, he was again convicted of possessing a controlled substance. *See* Case No. CF-2004-286, Washington County District Court, State of Oklahoma. He then received two convictions in 2006 for illegally possessing a firearm as a felon. *See id.*, Case Nos. CF-2005-426, CF-2006-108. In 2011, he was convicted of two counts of possessing a controlled substance and convicted on a separate occasion of aggravated assault and battery. *See id.*, Case Nos. CF-2010-161, CF-2011-139. Under Oklahoma law at the time of Sutton's convictions, all these crimes were felonies, punishable by a term of imprisonment exceeding one year. *See* Okla. Stat. tit. 21, §§ 1436(2), 1713.

On May 22, 2024, a federal grand jury charged Sutton with possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). [ECF No. 2]. The indictment alleges that Sutton, knowing that he had previously been convicted of crimes punishable by

imprisonment for terms exceeding one year, knowingly possessed a Smith and Wesson, .38 Special caliber revolver and five rounds of Federal .38 Special caliber ammunition. [*Id.*].

Sutton now moves to dismiss the indictment, claiming that § 922(g)(1) is unconstitutional on its face and as applied to him. [ECF No. 27]. The Court held a hearing on Sutton's motion on August 13, 2024.

## II. Second Amendment Jurisprudence

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees an individual right to possess firearms. 554 U.S. 570, 595 (2008). The Court observed that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons[.]" *Id.* at 626. The Tenth Circuit relied on this observation in *United States v. McCane* to reject a Second Amendment challenge to 18 U.S.C. § 922(g)(1)—the federal statute banning felons from possessing firearms or ammunition. 573 F.3d 1037, 1047 (10th Cir. 2009).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court set out a two-step test for determining whether legislation regulating the use or possession of firearms violates the Second Amendment. 597 U.S. 1 (2022). Under *Bruen*, a court considering such a challenge must first determine whether the Amendment's "plain text covers an individual's conduct." *Id.* at 24. If so, "the Constitution presumptively protects that conduct" and "the

3

government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*; *see also id.* at 17 ("To justify its regulation, the government may not simply posit that the regulation promotes an important interest.").

*Bruen* offered guidance for making the historical inquiry at the second step. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence," although not necessarily dispositive, "that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Likewise, if "earlier generations addressed th[at same] societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. However, the historical inquiry is not a "regulatory straightjacket[.]" *Id.* at 30. It "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original).

In *United States v. Rahimi*, the Supreme Court provided additional insight into how courts should approach the historical analysis laid out in *Bruen*. 602 U.S. --, 144 S. Ct. 1889 (2024). Because the Second Amendment allows "more than just those regulations identical to ones that could be found in 1791," the Court directed that lower courts "must ascertain whether the

new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 1898 (cleaned up). Contemporary laws that address problems like those addressed by the restriction need not "precisely match its historical precursors" to "pass constitutional muster." *Id.* (quoting *Bruen*, 597 U.S. at 30). And although it "must comport with the principles underlying the Second Amendment," the contemporary restriction "need not be a dead ringer or a historical twin." *Id.* (cleaned up). Finally, when drawing analogies to historical regulations, courts should consider "[w]hy and how the regulation burdens the right" to bear arms. *Id.* (citing *Bruen*, 597 U.S. at 29).

In *Vincent v. Garland*, which came after *Bruen* and before *Rahimi*, the Tenth Circuit held that *Bruen* did not "indisputably and pellucidly abrogate[]" its precedent set out in *McCane*. 80 F.4th 1197, 1202 (10th Cir. 2023), *cert. granted, judgment vacated*, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024). Following *Rahimi*, the Supreme Court vacated the judgment in *Vincent* and remanded the case for further consideration in light of *Rahimi*. *Vincent*, No. 23-683, 2024 WL 3259668.

## III. Analysis

Sutton argues that the indictment against him should be dismissed under *Bruen* and *Rahimi* because his conduct is covered by the plain text of the Second Amendment and the government cannot prove that § 922(g)(1), both

5

facially and as applied to him, is consistent with this Nation's historical tradition of regulating firearms. [ECF No. 27 at 1, 7]. In support, he cites *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) and various district court decisions. [*Id*. at 7–9]. He further argues that this Court may not rely on *Vincent* to deny his motion because that opinion did not apply the new test set out in *Bruen* and was vacated after *Rahimi*. [*Id*. at 11–15].

In response, the government argues that *McCane* forecloses Sutton's challenge because it remains binding precedent that this Court must follow. [ECF No. 37 at 7–10]. The government asserts that the order granting certiorari, vacating the judgment below, and remanding the case ("the GVR") in *Vincent* does not affect the merits of *McCane*'s holding, and neither *Bruen* nor *Rahimi* abrogated *McCane*. [*Id*.]. Further, the government claims, even if *McCane* was abrogated under *Rahimi* or *Bruen*, § 922(g)(1) remains constitutional on its face and as applied to Sutton under the *Bruen* framework. [*Id*. at 10–23].

At the hearing on Defendant's motion, the government reiterated a point made in its briefing: that although *Vincent* was vacated following *Rahimi*, the Supreme Court vacated **all** circuit court decisions considering § 922(g)(1)'s constitutionality. This included both circuit court decisions like *Vincent*. and decisions that endorse arguments like the ones Sutton makes here. In effect,

the government argued that the Supreme Court chose not to put its thumb on the scale regarding the constitutionality of § 922(g)(1) but left the matter open for further development by the lower courts consistent with its guidance in *Rahimi*.

The government also claimed that *Vincent*'s reasoning showed that *McCane* relied solely on *Heller*'s guidance that § 922(g)(1) is presumptively lawful, and *Rahimi*'s eight to one majority reiterating *Heller*'s "presumptively lawful" statement further demonstrates that *Bruen* could not have pellucidly abrogated *McCane*.

Last, the government urged the Court not to parse convictions for as-applied challenges for two reasons. First, the government argued that a categorical approach "crime of violence" analysis has no support in the history of firearm regulation. Second, the government argued that applying the categorical "crime of violence" analysis would leave individuals unable to understand if they are a prohibited person under § 922(g)(1).

Although Sutton stood on his brief at the hearing, he filed a reply. [ECF No. 41]. In his reply, Sutton argues that *McCane* does not foreclose his challenge because it was decided "before *Bruen* and engaged in no historical analysis." [*Id*. at 5]. He claims that this Court must "engage in only a text-and-history analysis absent any means-end justification," as *Bruen* and *Rahimi* demand. [*Id*. at 5–6]. He further asserts that he is among the people

7

protected by the Second Amendment, despite his felon status, and that the "government has failed to demonstrate that [§ 922(g)(1)] is consistent with the Nation's historical tradition of firearm regulation." [*Id.* at 16].

### A. McCane forecloses Sutton's challenge.

The Tenth Circuit is "bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *United States v. Manzanares*, 956 F.3d 1220, 1225 (10th Cir. 2020). However, an exception exists when the Supreme Court issues an opinion contradicting or invalidating the analysis in Tenth Circuit precedent. *United States v. Brooks*, 751 F.3d 1204, 1209–10 (10th Cir. 2014). Only when intervening law "is so indisputable and pellucid" does the exception apply. *See Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015) (finding intervening caselaw not "so indisputable and pellucid" to permit a finding contrary to binding precedent).

Neither *Bruen* nor *Rahimi* abrogated *McCane*. Finding that "means-end scrutiny in the Second Amendment context" was "one step too many," the *Bruen* Court applied a historical analysis consistent with *Heller*. *See Bruen*, 597 U.S. at 19–26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."). In *McCane*, the Tenth Circuit did not rely on means-end scrutiny to uphold

8

§ 922(g)(1). Rather, it relied on *Heller*'s explicit statement that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *United States v. McCane*, 573 F.3d at 1047 (quoting *Heller*, 554 U.S. at 626). Justice Kavanaugh's concurring opinion in *Bruen* reiterated *Heller*'s explicit statement. *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). Therefore, *Bruen* did not contradict or invalidate the Tenth Circuit's analysis in *McCane*.

In *Vincent*, the Tenth Circuit concluded that *Bruen* did not abrogate *McCane*, but rather inferred support for prohibiting felons from possessing firearms, noting "the six Justices' reaffirmation of the *Heller* language and the Court's apparent approval of 'shall-issue' regimes and related background checks." *Vincent*, 80 F.4th at 1201–02. Although the Supreme Court vacated the judgment in *Vincent* and remanded the case in light of *Rahimi*, it did not question the merits of *McCane* or express any doubt about the Tenth Circuit's reasoning in *Vincent* when doing so. A GVR "is appropriate when 'intervening developments ... reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome' of the matter." *Wellons v. Hall*, 558 U.S. 220, 225 (2010) (quoting *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam)). However, the GVRs for circuit decisions involving challenges to

§ 922(g)(1) that issued immediately following *Rahimi*, the Supreme Court acted consistently across all circuits, without any regard to the prevailing party below. *See* Order List, dated July 2, 2024, at 2–8, available at https:// www.supremecourt.gov/orders/courtorders/070224zor_2co3.pdf (issuing GVR orders to the Second, Third, Fifth, Eighth, and Tenth circuits for further consideration in light of *Rahimi*). Therefore, the Court finds that the GVR in *Vincent* cannot show any "reasonable probability" that the Tenth Circuit will reject *McCane* and come to a different "ultimate outcome" upon reconsideration.

Further, the Tenth Circuit has recently found that *Rahimi* did not "indisputably and pellucidly abrogate" *McCane* and does not alter *Vincent*'s conclusion. *United States v. Curry*, No. 23-1047, 2024 WL 3219693 at *4 n.7 (10th Cir. June 28, 2024) (unpublished). *Bruen* clarified the test for assessing Second Amendment challenges, and *Rahimi* applied *Bruen*'s test to a different federal firearm regulation than the one at issue here. *See Rahimi*, 144 S. Ct. at 1898–1902. Although *Rahimi* resolved the constitutionality of § 922(g)(8), it did not "undertake an exhaustive analysis of the full scope of the Second Amendment." *Id*. at 1903 (quotation marks and ellipsis omitted). The Court "conclude[d] only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id*. The Court did not opine on

10

§ 922(g)(1) beyond reiterating that "prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id*. at 1902 (quoting *Heller*, 554 U.S. at 626 n.26). It thus did not unequivocally overrule *McCane*.

This Court is obligated to apply Tenth Circuit precedent. *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990). Because neither *Bruen* nor *Rahimi* indisputably and pellucidly abrogated *McCane*, *McCane* remains binding authority upon this Court. Accordingly, Sutton's facial and as-applied challenges to § 922(g)(1) are denied.

### B. Even if Sutton's claims were not foreclosed by McCane, § 922(g)(1) is constitutional under Bruen's framework.

#### 1. The Second Amendment presumptively protects Sutton's conduct.

Under *Bruen*, the court must first determine whether the Second Amendment's plain text covers Sutton's conduct. If so, "the Constitution presumptively protects [his] conduct." *Bruen*, 597 U.S. at 24. The Second Amendment states that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

In *Heller*, the Court engaged in a textual analysis of the Second Amendment's language to determine that the Constitution protects the right of individuals to possess and carry weapons in case of confrontation. 554 U.S.

at 592. That textual analysis was confirmed by "the historical background of the Second Amendment." *Id*.

Here, the parties do not dispute that Sutton falls within "the people" as contemplated by the Second Amendment. Nor do they dispute that the Smith and Wesson .38 Special revolver is an "arm" within the Second Amendment's protection. So, the Court must determine whether Sutton's possession of the firearm is presumptively protected under the Second Amendment right to "keep and bear" arms.

Sutton is charged under a statute that criminalizes possession of a firearm with knowledge of the possessor's convicted status. *See* 18 U.S.C. § 922(g)(1); *see also Rahaif v. United States*, 139 S. Ct. 2191 (2019) (holding that a defendant must have knowledge of his convicted status); 10th Cir. Crim. Pattern Jury Instr. 2.44 (listing as an element of the offense, "the defendant knew he was convicted of a felony at the time he possessed a firearm."). Therefore, the government contends that Sutton's relevant conduct is the possession of a firearm with knowledge of his underlying convictions. [ECF No. 37 at 13]. But this approach does not fit under *Bruen*'s first step, which requires a plain text analysis. The Second Amendment protects "keep[ing]" and "bear[ing]" arms. *Bruen*, 597 U.S. at 32. By possessing the revolver, Sutton "kept" the weapon. *See Heller*, 554 U.S. at 582–83 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons'

12

... '[k]eep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*.") (emphasis in original). Thus, when analyzing § 922(g)(1), the relevant conduct is mere possession of the firearm.

The government attempts to add a historical tradition burden into *Bruen*'s first step by discussing the purported historical tradition of regulating firearm use by those engaged in certain conduct and various classes of people. [ECF No. 37 at 14–16]. "But *Bruen* makes clear that the first step is one based solely on the text of the Second Amendment to determine if it presumptively protects an individual's conduct—a presumption that the United States can *then* rebut with history and tradition." *United States v. Harrison*, No. CR-22-00328-PRW, 654 F. Supp. 3d 1191, 1198 (W.D. Okla. Feb. 3, 2023) (emphasis in original).

Because the plain text of the Second Amendment covers Sutton's conduct, his conduct is presumptively constitutionally protected. Thus, if his claims were not foreclosed by *McCane*, the government would be required to "justify [§ 922(g)(1) by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

   *2. Section 922(g)(1) is constitutional because it is consistent with the
   Nation's historical tradition of firearm regulation.*

   a.  <u>Section 922(g)(1) is constitutional on its face.</u>

*Rahimi* explained that "the Second Amendment permits more than just

those regulations identical to ones that could be found in 1791." 144 S. Ct. at

1897–98. The "appropriate analysis" does not require a consistent Founding

Era regulation; rather, it "involves considering whether the challenged

regulation is consistent with the principles that underpin our regulatory

tradition." *Id*. at 1898. Thus, "[a] court must ascertain whether the new law

is 'relevantly similar' to laws that our tradition is understood to permit." *Id*.

   Here, the government has met its burden of demonstrating that

§ 922(g)(1) is "relevantly similar" to the Nation's tradition of firearm

regulation. Specifically, the government cites several historical analogues

demonstrating the Founder's recognition of the need to consider public safety

as part of the right to bear arms. [ECF No. 37 at 16–22]. The Court finds

several examples most compelling.

   First, the government cites *United States v. Coombes* as an example of a

court in this district recognizing several historical analogues supporting the

constitutionality of § 922(g)(1). 629 F. Supp. 3d 1149, 1157–60 (N.D. Okla.

Sept. 21, 2022). *Coombes* cited the use of Bills of Attainer and a Founding-

Era New York statute prohibiting felons from possessing property. *Id*. at

14

1157–1158. The states' constitutional ratification conventions also provided "insight into historical firearm restrictions on felons." *Id.* at 1158. Specifically, they demonstrated "the view that the state possessed the right to prohibit those who had committed prior bad acts from keeping a firearm." *Id.* at 1159. "The Dissent of the Minority," which heavily influenced the adoption of the Second Amendment and was published by the Anti-Federalists during the ratification debate in Pennsylvania, stated that "no law shall be passed for disarming the people or any of them unless from crimes committed." *Coombes*, 629 F. Supp. 3d at 1158 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History*, 665 (1971)); [ECF No. 37 at 18].

Next, the government adds to this historical analysis evidence of the harsh sentences for felony convictions. [ECF No. 37 at 18]. In the late Eighteenth Century, death was "the standard penalty for all serious crimes." *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring). The First Congress treated "forgery, [dealing in] forged securities, [and] counterfeiting" as capital crimes. *Folajtar v. Att'y Gen. U.S.*, 980 F.3d 897, 905 (3d Cir. 2020) (first alteration in original) (quoting John D. Bessler, *Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment* 56–57 (2012)). The government argues "[b]ecause many felonies were punishable by death," it renders "tame by comparison the punishment of gun relinquishment." [ECF No. 37 at 18].

15

In response, Sutton claims that it is "simply not relevant" "[w]ho was eligible for execution in early America." [ECF No. 41 at 11]. However, *Rahimi* found that the penalty is "another relevant aspect of the burden," and reasoned that "going armed laws provided for imprisonment … and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Rahimi*, 144 S.Ct. at 1902. The Court finds the same reasoning applies here. If the government at the time of Founding had the ability to execute an individual for a felony, then certainly they would have had the lesser inherent authority to disarm that individual.

The government provides additional historical evidence demonstrating that § 922(g)(1) fits within the Nation's historical tradition. [ECF No. 37 at 19–21]. Early legislators enacted laws disarming people who had committed certain offenses not punishable by death. For example, an English statute provided that a person could not "keep arms" if he had been "convicted in a court of law of not attending the service of the church of England." 4 William Blackstone, *Commentaries on the Laws of England* 55 (1769). In 1624, Virginia punished a person for "base" and "opprobrious" speech by ordering him "disarmed" and declaring him ineligible to exercise "any priviledge or freedom" in the colony. David Thomas Koning, *"Dale's Laws" and the Non-*

16

*Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist.
354, 371 (1982). And in 1775, Connecticut enacted a statute providing that a
person who was convicted of "libel[ing] or defam[ing]" certain colonial
resolutions "shall be disarmed and not allowed to have or keep any arms."
*The Public Records of the Colony of Connecticut From May, 1775 to June,
1776* 193 (Charles J. Hoadly ed., 1890).

Early American justice-of-the-peace manuals explained that they had the
authority to confiscate the arms of people who carried them in a manner that
spread fear or terror. *See*, *e.g.*, James Davis, *The Office and Authority of a
Justice of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's
Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William Waller
Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's
Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James
Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor
Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor
Generalis* 11 (Robert Campbell printing 1792) (Pa.). The rule was expressly
recodified in some 17th- and 18th-century American statutes. *See* Act of Nov.
1, 1692, ch. 18, § 6, 1 Acts and Resolves of the Province of Massachusetts Bay
52–53 (1869); Act of June 14, 1701, ch. 7, 1 Laws of New Hampshire 679
(Albert Stillman Batchellor ed., 1904); Act of Nov. 27, 1786, ch. 21, A
Collection of all such Acts of the General Assembly of Virginia, of a Public

and Permanent Nature, as are now in Force 33 (1794). And other statutes made forfeiture part of the penalty for offenses like storing guns or gunpowder in an unsafe manner. *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan ed., 1868); Act of Mar. 15, 1788, ch. 81, § 1, 2 *Laws of the State of New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-10 (1906).

And the surety laws cited in *Bruen* and *Rahimi* targeted "those threatening to do harm." *Bruen*, 597 U.S. at 55. A person was required to post a bond "only when 'attended with circumstances giving just reason to fear that he purpose[d] to make an unlawful use of [firearms.]'" *Id*. at 56 (quoting William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829)). *Rahimi* also found the surety laws targeted "the misuse of firearms." 144 S. Ct. at 1900.

"Laws targeting those who engaged in rebellion were also justified on the grounds that such persons posed a danger to public safety. These laws demonstrate that 'persons who by their actions ... betray a likelihood of violence against the state may be disarmed.'" *United States v. Harrison*, 654 F. Supp. 3d 1191, 1210–11 (W.D. Okla. Feb. 3, 2023) (quoting C. Kevin

18

Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J. L. & Pub. Pol'y 695, 727–28 (2009)).

Therefore, laws disarming those who posed a danger to public safety are "relevantly similar" historical analogues to § 922(g)(1), because they share a similar purpose—to protect society from gun violence by those whose prior conduct evidences a "special danger of misuse." *See Rahimi*, 144 S. Ct. at 1901. The Court concludes that the government has met its burden of showing § 922(g)(1) is facially constitutional because it is consistent with the Nation's historical tradition of firearm regulation.

Moreover, post-*Bruen*, an overwhelming number of courts have upheld the constitutionality of § 922(g)(1). *See, e.g.*, *United States v. Coleman*, No. 3:22-CR-87 (DJN), 2023 WL 6690935, at *1–2, *19 (E.D. Va. Oct. 12, 2023) (holding § 922(g)(1) "constitutional as to violent and nonviolent felons alike" before citing more than 170 federal district court opinions from across the Nation rejecting post-*Bruen* challenges to the constitutionality of § 922(g)(1)).

*Rahimi* has left even less room for challenges to § 922(g)(1). The handful of courts that have addressed the constitutionality of § 922(g)(1) since *Rahimi* have recognized that the decision, if anything, strengthens the statute's constitutionality. *See, e.g.*, *United States v. Banks*, No. 24-25, 2024 WL 3251725, at *3 (E.D. Penn. June 21, 2024) (rejecting an as-applied challenge to § 922(g)(1) when the defendant's prior offenses were drug offenses, noting

*Rahimi*'s emphasis that the analysis under *Bruen* is "not meant to suggest a law trapped in amber"); *United States v. Levasseur*, No. 22-cr-00155-LEW, 2024 WL 3358221, at *3 (D. Me. July 9, 2024) (recognizing *Rahimi* as "a data point about the appropriate level of generality when interpreting the Second Amendment."); *United States v. Ayala*, No. 22-CR-282 (VSB), 2024 WL 3376083, at *5 (S.D.N.Y. July 11, 2024) (finding *Rahimi*'s endorsement of *Heller*'s statement that "many … prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful,'" supported denial of a facial challenge to § 922(g)(1)); *United States v. Jones*, No. 23-20275, 2024 WL 3297060, at *6–8 (E.D. Mich. July 2, 2024) (upholding § 922(g)(1) as constitutional and citing *Rahimi* for the principle that firearm regulations need not have "historical twin" to be "relevantly similar" to contemporary laws); *United States v. Elliott*, No. 21-88, 2024 WL 3161879, at *2 (E.D. La. June 24, 2024) ("The Supreme Court's decision in *Rahimi* further supports this Court's finding that 18 U.S.C. § 922(g)(1) ... is constitutional."); *United States v. Young*, No. 20-cr-391 (RA), 2024 WL 3184709, at *4 (S.D.N.Y. June 25, 2024) (rejecting challenge to § 922(g)(1) in part by referencing *Rahimi*); *United States v. Morales*, No. 24 Cr. 84 (PAE), 2024 WL 3345982, at *2 (S.D.N.Y. July 8, 2024) (rejecting a facial challenge to § 922(g)(1) because "*Rahimi*, if anything, bolsters § 922(g)(1)'s constitutionality").

b.  <u>Section 922(g)(1) is constitutional as applied to Sutton.</u>

The distinction between facial and as-applied challenges to a law's constitutionality "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[I]t does not speak at all to the substantive rule of law necessary to establish a constitutional violation[;]" therefore, the same substantive constitutional analysis applies. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). Considering the full measure of disability imposed on felons by § 922(g)(1), the Court must ask whether historical analogues to contemporary laws exist that prohibit felons like Sutton from possessing firearms.

Sutton argues that his prior felony convictions are not the kind of convictions that would find historical support for the complete and perpetual disarmament of persons otherwise protected by the Second Amendment. [ECF No. 27 at 4–5]. Specifically, he argues that § 922(g)(1) is unconstitutional as applied to him because his drug possession convictions and his conviction for Oklahoma aggravated assault and battery are "non-violent" crimes. [*Id*. at 4, 8]. In support, Sutton cites the Third Circuit en banc decision in *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), finding § 922(g)(1) unconstitutional as applied to a defendant with a single, non-violent felony conviction. [*Id*. at 7–8]. However, *Range*, like *Vincent*, was vacated under a GVR following *Rahimi. Garland v. Range*, -- S.

21

Ct. --, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024). Sutton further relies on several district court decisions across the country that followed suit, declaring § 922(g)(1) unconstitutional as applied to defendants with very different criminal histories. [ECF No. 27 at 8–9; ECF No. 41 at 15].

Having reviewed these decisions, the Court is unconvinced that a violent/non-violent approach to assess the as-applied constitutionality of § 922(g)(1) is appropriate. Parsing out convictions for the purpose of as-applied challenges to § 922(g)(1) is unsupported in any of the Second Amendment jurisprudence set out by the Supreme Court or the Tenth Circuit.

Moreover, the Founders made no indication that only violent felonies were a distinction used in determining disarmament. Although danger to the public and the country were considerations at Founding, no categorical "crime of violence" determination[1] was made when considering whether an

---

[1] Although Sutton does not argue that § 922(g)(1) is unconstitutional as-applied to him under an elements-based categorical approach, the violent/non-violent felony analysis he requests from the Court necessarily involves considering whether a conviction is categorically a crime of violence today before assessing whether the crime was of the type that led to disarmament at Founding. The categorical "crime of violence" analysis can be counterintuitive and the analysis for identically named crimes can differ from one jurisdiction to the next. Thus, the Court finds this approach inappropriate in the Second Amendment context. Moreover, parsing out convictions as violent/non-violent leads to due process concerns, because the approach leads to individuals not being able to determine whether their conduct is prohibited under § 922(g)(1). *See Bouie v. City of Columbia*, 378 U.S. 347, 350 (1964) (holding the Due Process Clause requires "a criminal statute give fair warning of the conduct which it prohibits."). For these additional reasons, the Court declines to conduct a violent/non-violent felony analysis for as-applied challenges to § 922(g)(1).

individual could possess a firearm. As shown above, the government has provided ample evidence showing that non-violent felonies were punishable by death in cases involving crimes like forgery or counterfeiting. The Supreme Court found the lesser restriction of temporary disarmament permissible in *Rahimi* when "imprisonment was permissible under the surety laws." *Rahimi*, 144 S.Ct. at 1902. The same reasoning applies here. If the government had the authority to execute someone for a non-violent felony at Founding, surely, they had the lesser authority to disarm them.

As another judge in this Circuit recently explained, "[i]f the Supreme Court wants to create a violent/non-violent felony exception to its Second Amendment analysis, that is a task for the Supreme Court to do rather than a district court." *United States v. Teston*, --F. Supp. 3d--, No. CR 22-1400 JB, 2024 WL 1621512, at *23 (D.N.M. April 15, 2024) (rejecting a categorical approach to assessing the constitutionality of felon dispossession statutes). Neither *Bruen* nor *Rahimi* outlined any such exception. And the Tenth Circuit found in *Vincent* that, under *McCane*, it had "no basis to draw constitutional distinctions based on the type of felony involved." 80 F.4th at 1202. Although *Vincent* has been vacated, this Court has no reason to believe the Tenth Circuit will hold these distinctions necessary upon remand. Therefore, the Court rejects a conviction-by-conviction violent/non-violent approach to determine the constitutionality of § 922(g)(1) as applied to felons.

Because Sutton is a convicted felon and the Nation's history and tradition of firearm regulation is consistent with disarming felons, § 922(g)(1) is constitutional as applied to him.

## IV. Conclusion

The Court denies Sutton's motion under binding precedent set out in *McCane*. However, even if *McCane* was abrogated under *Bruen* or *Rahimi*, his claims fail under *Bruen*'s framework. Because this Nation's historical tradition of firearm regulation at the time the Second Amendment was adopted includes laws that are analogous to the contemporary disarmament of convicted felons like Sutton, § 922(g)(1) is a valid exercise of congressional authority. Therefore, Sutton's motion to dismiss the indictment [ECF No. 27] is denied.

IT IS SO ORDERED on this 23rd day of August, 2024.

Sara E. Hill
UNITED STATES DISTRICT JUDGE