IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TIMOTHY ALLEN SUTTON,<br><br>Defendant. | Case No. 24-CR-00168-SEH |

## OPINION AND ORDER

Before the Court are Defendant Timothy Sutton's motions to suppress evidence and supplemental motion. [ECF Nos. 19, 26, 43]. Sutton moves the Court to suppress all evidence seized directly or indirectly as a result of a traffic stop, arguing that the officer who stopped him did not have reasonable suspicion to support prolonging the stop past its traffic-based mission. [ECF No. 19]. He further contends that the search of the Jeep he was driving was not supported by probable cause because the K9 officer that alerted to the Jeep was not reliable. [ECF No. 26].

The government responds that the traffic stop was based on reasonable suspicion and was not unlawfully prolonged. [ECF No. 28]. It further argues that the K9 officer's alert provided probable cause to search the Jeep and, even if did not, the firearm found in the Jeep would have inevitably been

lawfully discovered during an inventory search following Sutton's arrest on an active warrant. [ECF No. 38].

The Court held an evidentiary hearing on the motions to suppress on August 13, 2024. For the reasons provided below, the motions are denied.

**I. Background**

Around 9:00 p.m. on October 30, 2022, Bartlesville Police Department Officer Levi Johnson noticed a red Jeep Cherokee with a Texas license plate parked at a gas station.[1] Earlier in the day, Johnson had spotted the same Jeep parked at a "known drug house" in Bartlesville.

Johnson pulled into a nearby parking lot and watched as a man walked out of the gas station and entered the driver's side of the Jeep. Johnson thought it took an abnormally long time for the Jeep to pull away from the gas station and speculated that the driver may have been waiting for his patrol car to leave before pulling away. At some point, Johnson ran the Texas tag and discovered it was expired; he also requested assistance from fellow Bartlesville Police Department Officer Joshua Newell and his K9, Officer Drago.[2] Johnson followed the Jeep for approximately seven blocks before initiating a traffic stop.

---

[1] Bartlesville Police Department Officers Johnson and Newell each testified during the evidentiary hearing. This background information is based on that testimony.
[2] Officer Johnson testified that he did not remember exactly when he called Officer Newell or ran the tag.

2

The footage[3] shows that Johnson approached the Jeep and saw Sutton as its sole occupant.[4] While he and Sutton talked, Johnson thought, based on his training and experience, that Sutton appeared to be avoiding eye contact and turning his body as if to conceal something. Johnson also thought that Sutton twisted his body in an unusual way to block Johnson's view of the passenger seat. Using his flashlight, Johnson looked into the back seat through the Jeep's windows but saw nothing of concern. About two minutes into the stop, Johnson took Sutton's driver's license and proof of insurance and walked back to his patrol car.[5]

Once in his patrol car, Johnson entered Sutton's driver's license information into his computer. Between 2:33 to 4:03, as reflected on the time stamps of the video, Johnson learned that Sutton's driver's license appeared to be valid, and that he had an active arrest warrant.[6] Johnson then went to an internet browser on his laptop and accessed both Google and On Demand

---

[3] Although Johnson wore a department-issued body-worn camera, he failed to push the button on his camera to activate it until a couple minutes into the stop. This resulted in the footage of the recorded stop having video but no audio during the first two minutes.
[4] The government played an excerpt of Officer Johnson's body-worn camera footage during his testimony.
[5] At two minutes and 33 seconds into the traffic stop, when Johnson returned to his patrol car, audio to his body-worn camera footage began.
[6] Johnson testified that his discovery of the active warrant changed what he intended to do during the stop, but admitted during cross-examination that he told other officers who later arrived at the scene that "if everything checked out" he would not arrest Sutton but only advise him to take care of the warrant.

Court Records (ODCR) to determine Sutton's criminal history. Johnson testified that he routinely performs such checks during traffic stops, and that he would want to know an individual's criminal history before effectuating an arrest. He further testified that an average traffic stop typically takes him between 8 and ten minutes to complete.

From timestamp 6:40 to 6:45, Officer Newell appeared at the passenger side window of Johnson's patrol car and Johnson informed him that Sutton had a "hold;" meaning, he had an active warrant for his arrest. Newell took K9 Officer Drago to the Jeep and he alerted somewhere between 6:45 and seven minutes into the stop.

Newell testified that he had served as a K9 Officer for approximately five years, and that he worked with Drago from October 2020 to February 2024. He further testified that he and Drago received certification as a team from the Council on Law Enforcement Education and Training ("CLEET") and were certified the entire time they worked together. Upon the alert, Newell gave Johnson a "thumbs up," signaling a positive alert. Johnson testified that he had worked with Newell and his K9 officer many times before this incident, and that it was common practice to use a "thumbs up" to signal a positive alert.

At seven minutes and 57 seconds into the stop, Johnson stepped out of his patrol car and approached four additional officers who had arrived at the

4

scene. When officers asked Sutton to step out of the Jeep, Sutton refused to comply. After forcibly removing him, the officers searched the Jeep and found two open containers of alcohol and a glass pipe typically used to smoke methamphetamine. Under the driver's seat, they found a loaded Smith and Wesson .38 caliber revolver.

A federal grand jury charged Sutton with felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). [ECF No. 2]. Sutton now moves the Court to suppress all evidence seized during the stop. [ECF Nos. 19, 26].

## II. Applicable Standard

A traffic stop is an investigative detention governed by the standards set forth in *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Morgan*, 855 F.3d 1122, 1125 (10th Cir. 2017). Therefore, it must comply with the Fourth Amendment's proscription against unreasonable seizures. In determining the constitutional reasonableness of a traffic stop, a court must make a dual inquiry. First, the court must decide whether the traffic stop "was justified at its inception." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (citations omitted). A traffic stop is valid at its inception "if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* Second, the length of detention must be limited in scope to the

5

initial purpose of the traffic stop; meaning, an officer may not unreasonably extend the duration of the stop. *United States v. Rice*, 483 F.3d 1079,1083 (10th Cir. 2007). An officer may extend the length of the traffic stop beyond its initial purpose only if "the officer has independent reasonable suspicion of criminal wrongdoing," or the driver voluntarily consents. *United States v. Gomez-Arzate*, 981 F.3d 832, 839 (10th Cir. 2020) (citation omitted).

## III. Analysis

Sutton does not challenge the legality of the initial traffic stop. And he does not dispute that a valid K9 alert gives officers probable cause to search a vehicle. Rather, he argues that the officers prolonged the stop past its initial purpose to permit time for the dog sniff to occur in violation of the Fourth Amendment. [ECF No. 19]. He further asserts that the dog's alert did not provide probable cause for the search because the dog was unreliable. [ECF No. 26]. Both his arguments fail.

### A. *The dog sniff did not prolong the traffic stop because it was contemporaneous with Officer Johnson's tasks related to completing the stop.*

First, the dog sniff was conducted during a lawful traffic stop and did not prolong the time needed to complete the stop's traffic-based mission. An officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," which include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting

6

the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (citations omitted). But "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. Dog sniffs conducted during a lawful traffic stop do not violate the Fourth Amendment unless they prolong the stop "beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id.* at 350 (cleaned up).

Whether officers impermissibly extended a stop is a determination of fact. *United States v. Malone*, 10 F.4th 1120, 1124 (10th Cir. 2021) (citation omitted). A stop is unlawfully extended when officers pursue unrelated activities that extend the stop beyond "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354; *see also United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022). "Even de minimis delays caused by unrelated inquiries violate the Fourth Amendment." *United States v. Mayville*, 955 F.3d 825, 830 (10th Cir. 2020).

However, "neither the Fourth Amendment nor Supreme Court precedent requires officers to use the least intrusive or most efficient means conceivable to effectuate a traffic stop." *United States v. Baker*, 108 F.4th 1241, 1247–48 (10th Cir. 2024) (quoting *Mayville*, 955 F.3d at 832) (internal quotation marks and brackets omitted). "And when a dog sniff is conducted

7

contemporaneously with an officer's 'reasonably diligent pursuit' of the traffic stop's mission — i.e., while traffic-related tasks are ongoing — the search does not add time to the traffic stop." *Id.* (quoting *Mayville*, 955 F.3d at 833).

The Tenth Circuit, in applying *Rodriguez*, set out a three-part test to help courts determine whether an unlawful seizure has occurred. Specifically, a traffic stop is unlawfully extended when an officer: "(1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by an independent reasonable suspicion." *Baker*, 108 F.4th at 1248 (quoting *Frazier*, 30 F.4th at 1173) (internal quotation marks omitted).

Here, Johnson testified that he routinely checked ODCR during his traffic stops, and that he would want to know an individual's criminal history before effectuating an arrest. Because Johnson's testimony demonstrated that this task was a routine precautionary measure utilized in most traffic stops, as opposed to a precaution exclusively "taken in order to facilitate" an "investigation into other crimes," the Court finds that Johnson's search of ODCR was objectively reasonable and directly related to the traffic-based mission. Moreover, the Tenth Circuit "has routinely permitted officers to conduct criminal-history checks during traffic stops in the interest of officer

safety." *United States v. Cates*, 73 F.4th 795, 806 n.3 (10th Cir. 2023) (quoting *Mayville*, 955 F.3d at 830).

The Court further finds that the dog sniff and alert were contemporaneous with Johnson diligently executing tasks related to the traffic stop. "When a dog sniff and alert occur contemporaneously with an officer's pursuit of the traffic-based mission of the stop, the stop is not prolonged." *Baker*, 108 F.4th at 1251 (citing *Mayville*, 955 F.3d at 833; *Cates*, 73 F.4th at 807 (10th Cir. 2023); *Hoskins v. Withers*, 92 F.4th 1279, 1288 (10th Cir. 2024); *United States v. Dawson*, 90 F.4th 1286, 1291–92 (10th Cir. 2024)). "And the traffic-based mission of the stop includes both issuing a ticket or warning and attending to ordinary incidents of the stop, including safety concerns." *Id.* (citing *Dawson*, 90 F.4th at 1292; *Rodriguez*, 575 U.S. at 354). While Johnson checked Sutton's criminal history, Newell and Drago arrived on scene and conducted the dog sniff. Because the dog sniff and alert were contemporaneous with Johnson's ongoing traffic-related stop, the stop was not unlawfully prolonged under *Rodriguez*.

> **B. Training records established Drago's reliability and Sutton failed to undermine that showing; therefore, Drago's alert provided probable cause to search the Jeep.**

"[A] drug dog's alert establishes probable cause only if that dog is reliable." *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011); *see also United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) (a narcotics-

9

detection dog "must be 'reliable' or 'trained' in order for an alert to support probable cause"). "A party seeking to suppress evidence found during a search after a positive dog alert bears the burden of proving that the dog is unqualified." *Untied States v. Kitchell*, 653 F.3d 1206, 1224 (10th Cir. 2011) (citation omitted).

In considering a challenge to a narcotics dog's reliability a court need not "mount a full-scale statistical inquisition into [the] dog's history." *Ludwig*, 641 F.3d at 1251. "Instead, courts typically rely on the dog's certification as proof of its reliability," given that "canine professionals are better equipped than judges to say whether an individual dog is up to snuff." *Id.*; *see also Florida v. Harris*, 568 U.S. 237, 246–47 (2013) (finding "evidence of a dog's satisfactory performance in a certification or training program can" solely provide "sufficient reason to trust his alert." "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search.")).

Of course, "if a credentialing organization proved to be a sham, its certification would no longer serve as proof of reliability." *Ludwig*, 641 F.3d at 1251 (citations omitted). However, the Tenth Circuit has "recognized that in certain situations, a narcotics-detection dog's reliability can be established by means other than proof of certification." *Kitchell*, 653 F.3d at 1225 (citing

*Ludwig*, 641 F.3d at 1251 n. 3 ("An uncertified dog's accuracy could still, in theory at least, be established by examining its training history and record for reliability."); *Clarkson*, 551 F.3d at 1204 ("While successful completion of a training course and a current certification would be satisfactory, we do not exclude the possibility that reliability can be established by other evidence.")). And the Supreme Court has recognized that, even in the absence of formal certification, a court can presume that a dog's alert provides probable cause to search "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Harris*, 568 U.S. at 247.

However, a defendant must have an opportunity to challenge the reliability of the dog, either by "cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Harris*, 568 U.S. at 247. For example, the defendant may challenge the adequacy of a certification program, or "examine how the dog (or handler) performed in the assessments made in those settings." *Id*. "And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id*.

In any event, a probable cause determination based on a dog's alert should be assessed like any other inquiry into probable cause. "The question … is

11

whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Harris*, 568 U.S. at 247.

Here, evidence amply demonstrated that Drago's alert gave officers probable cause to search the Jeep. The government introduced substantial evidence of Drago's training and certification and Newell testified that he and Drago were CLEET certified. He testified that he and Drago had worked together as a team for approximately two years before the traffic stop in this case and stated that there were no breaks in their certification during the years they worked together. The government provided records demonstrating that Drago was certified to detect methamphetamine, heroin, and cocaine at the time of the traffic stop, and further provided a year's worth of training logs documenting Drago's 16 hours of training per month throughout 2022.

Sutton also had an opportunity to cross-examine Newell. During cross-examination, Newell was asked how he performed the assessments documented in his training logs and testified that non-productive responses from Drago did exist. He further testified that, based on his training and experience, he was unaware of any drug-detection dog that was perfect every time. Although the Tenth Circuit has previously noted that "[a] false alert occurs when no seizable amounts of contraband are located during a search,"

false alerts do not inevitably suggest "that the drug dog alerted without detecting any odor of narcotics." *United States v. Ruiz*, 664 F.3d 833, 841 n. 2 (10th Cir. 2012) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1375 n. 6 (10th Cir.1997)). "Drug dogs can detect narcotics residue that is left on objects that have come into contact with drugs, 'even though no seizable quantity [of drugs] has been found.'" *Id*.

Because certification and training records established Drago's reliability in detecting drugs and Sutton has failed to undermine that showing, officers had probable cause to search the Jeep based upon Drago's alert.

## IV. Conclusion

For the reasons stated above, the Court concludes that the stop was not unlawfully prolonged, and Drago's alert provided probable cause for the search. Based on this finding, the Court need not address whether the firearm would have inevitably been discovered through an inventory search.

IT IS THEREFORE ORDERED that Defendant's motions to suppress and supplemental motion [ECF Nos. 19, 26, 43] are DENIED.

DATED this 23rd day of August, 2024.

*Sara Hill*

Sara E. Hill
UNITED STATES DISTRICT JUDGE

13